RACHEL MAE ROSE *v.* S. C. ROSE, JR

5-6222                                   495 S.W. 2d 524

Opinion delivered June 4, 1973

*Lohnes T. Tiner,* for appellant.

*Carrold E. Ray,* for appellee.

CARLETON HARRIS, Chief Justice. This is a divorce case. Rachel Mae Rose, appellant herein, and S. C. Rose, Jr., appellee, were married on December 10, 1944, and separated in June, 1968. One child, Sammy Kieth Rose, an invalid, age 18 at the time of the final hearing, was born to the marriage. In July, 1968, Mrs. Rose instituted suit alleging that the parties had not lived together as husband and wife since June 21, 1968; that Mr. Rose was guilty of adultery and she was entitled to an absolute divorce. Thereafter, on April 9, 1969, the complaint was amended whereby Mrs. Rose sought only a divorce from bed and board. After a hearing, the St. Francis County Chancery Court held that Mrs. Rose was entitled to a divorce from bed and board; granted to her possession of the home owned by the parties, together with household items contained therein and also

gave her possession of a Buick automobile; awarded Mrs. Rose $100.00 per week; awarded custody of the minor child to Mrs. Rose and directed Mr. Rose to pay all necessary medical and hospital expenses of the son. Mr. Rose was further directed to pay taxes on the home and premiums on an adequate insurance policy. The court also found that certain certificates of deposit purchased by Rose in his wife's name were a gift and that Mrs. Rose was entitled to these certificates which had a total face value of $35,400.00. The court held that certificates of deposit in the name of the son were not within the jurisdiction of the court since he was not a party. Mr. Rose was awarded one certificate of deposit in the amount of $10,000, plus interest collected by his wife, and after Mrs. Rose's failure to surrender the certificate of deposit to appellant, the court ordered its cancellation by the bank and the issuance of a new certificate. Subsequently, Mrs. Rose amended her complaint and again sought an absolute divorce and the present action was commenced by appellant alleging general indignities and adultery as her grounds for absolute divorce. Appellee filed a cross-complaint seeking a divorce, alleging general indignities, and continuous separation without cohabitation since June 15, 1968. By decree of August 10, 1971, the court granted a divorce on three years separation without cohabitation, but this divorce was not given to either party, and the court reserved for future disposition other issues, which, of course, included property rights. Thereafter, other hearings were held on the question of property rights and the court entered its decree, finding that Mrs. Rose's prayer for property settlement, because of facts hereafter discussed, should be dismissed. From the decree of divorce and the order just mentioned, appellant brings this appeal. For reversal, it is first asserted that the trial court erred in dissolving the marriage without awarding one of the parties a divorce and that the court was in error in failing to grant Mrs. Rose a divorce on the grounds of adultery.

The seventh ground of our statute on divorce, Ark. Stat. Ann. § 34-1202 (Supp. 1971), provides as follows:

"Where either husband or wife have lived separate and apart from the other for three (3) consecutive

years, without cohabitation, the court shall grant an absolute decree of divorce at the suit of either party, whether such separation was the voluntary act or by the mutual consent of the parties and the question of who is the injured party shall be considered only in cases wherein by the pleadings the wife seeks either alimony under Section 34-1211, Arkansas Statutes 1947, or a division of property under Section 34-1214, Arkansas Statutes 1947, as hereby amended, or both."

This section is applicable to this litigation and the court should have rendered a ruling as to fault. We know of no change in the law that would affect our opinion in *Jones* v. *Jones*, 201 Ark. 546, 145 S.W. 2d 748, which involved the question of three years separation and the awarding of property rights. This court said:

"Act 20, after stating that the court shall grant an absolute decree of divorce at the suit of either party where husband and wife have lived apart from each other for three consecutive years without cohabitation, contains this language: ' . . .and the question of who is the injured party shall be considered only in the settlement of the property rights of the parties and the question of alimony.'

"Clearly (insofar as property may be used to compensate) here is an express direction that courts ascertain which spouse occasioned the injury *resulting in divorce by expiration of time,* and that compensation be in proportion to the degree of injury; otherwise the sentence would be meaningless."

In the litigation now before us, the court found that Mr. Rose was guilty of adultery and indeed, the charge was not even denied by appellee in his testimony. He admitted adultery with two different women and, in fact, admitted that he was living in adultery at the time of this litigation and the granting of the decree.[1]

---

[1]Mr. Rose married the person with whom he was living soon after this divorce was granted.

We think the divorce should have been granted to Mrs. Rose on this ground, and we so hold. While Arkansas apparently has no cases on the exact point of whether a divorce should be granted specifically to one of the parties, we certainly think, at the least, that this is far the better procedure. In *Friedman* v. *Friedman*, 100 So. 2d 167, the Supreme Court of Florida in a well-considered opinion by Justice Thornal, stated:

"The problem will arise only in those cases where both parties seek a divorce such as in the case before us. It will be recalled that the Chancellor merely 'dissolved the bonds of matrimony,' without finding the equities prevailing either way and without determining which party had established his or her entitlement to the divorce. In fairness to the Chancellor we should point out that within the confines of our own decisions there appear to be two lines of cases which could lead a trial judge in either direction. It is, therefore, quite understandable that the Chancellor here concluded that he was within the limits of controlling precedents when he found as he did merely dissolving the bonds of matrimony. We think this problem could be of importance in future cases and we, therefore, feel that we should resolve the problem and set the point at rest for the benefit of the Bar and future litigants.

"Admittedly, there is a division of authority around the country. In 17 Am. Jur., Divorce and Separation, Sec. 465, p. 574, it is stated generally that it has been held that a divorce decree does not necessarily have to state the party in whose favor it is granted. To support this statement the authors cite several cases from the Supreme Court of Arizona. This does seem to be the rule in Arizona and possibly some other states. Coming to our own prior decisions we encounter *Williamson* v. *Williamson*, 153 Fla. 357, 14 So. 2d 712, where the Chancellor merely divorced each party from the other. On appeal this court declined to reverse the Chancellor by adhering to the general statement of the proposition that the failure of a Chancellor to make specific findings of fact in an equity suit is not reversible error.

"However, we next examine *Sahler v. Sahler,* 154 Fla. 206, 17 So. 2d 105, where this court specifically held that it is incumbent upon the trial Chancellor in a divorce proceeding where both parties claim a right to a divorce to determine from the evidence who is at fault and specifically grant relief to the innocent party.

In *Macfadden v. Macfadden,* 157 Fla. 477, 26 So. 2d 502, we again stated that the final decree in a divorce proceeding such as the one now here should specifically designate the successful party. * * *

"After carefully considering the prior decisions we are of the view that the better rule as well as one which provides a more orderly procedure consistent with equitable principles requires that in a divorce proceeding where both parties lay claim to a divorce, it is the responsibility of the Chancellor in the first instance to specifically determine by his final decree the relative equities and designate the party entitled to the divorce and the one to whom it is granted. Consonant with this conclusion, therefore, we recede from anything appearing to the contrary in *Williamson v. Williamson, supra,* and adhere to the rule on this point as announced in *Sahler v. Sahler, supra,* and *Macfadden v. Macfadden, supra.*"[1-A]

We hold that a divorce must be granted to one of the parties, and in the present instance, that divorce should have been granted to Mrs. Rose.

The next two points really deal with the same subject and will be discussed together. It is contended that the trial court erred in refusing to award appellant her statutory interest in appellee's property, alimony, and in denying her any relief.

Normally, of course, it being determined that Mrs. Rose was the party entitled to the divorce, appellant would be awarded her statutory interest in the property, and perhaps an award of alimony would be in order. The chancellor refused to make any such award due to the fact that Mrs. Rose had taken, and used or secluded

[1-A] It might be mentioned that the Florida Legislature has now enacted legislation, setting up what is commonly called "No-Fault Divorce", such legislation becoming effective on July 1, 1971. See Fla. Stat. Ann. § 61.052 (Suppl. 1973).

monies that were not her own, and would not account for those sums to the court. It will be recalled that after dissolving the bonds of matrimony between the parties, the chancellor had held in abeyance any further findings until an additional hearing was held. This developed into several additional hearings, after which, the court entered lengthy findings in support of its action in dismissing appellant's prayer for a property settlement. The additional hearings were due to the efforts of the court in endeavoring to persuade Mrs. Rose to advise the court the disposition of the personal properties wrongfully taken. While it will add considerably to the length of this opinion, we think, because of the denial of any further property rights to appellant, and the unusual circumstances of this case, the clear defiance of, and lack of cooperation with, the trial court, that large portions of the record should be included in this opinion.

While the evidence is conflicting and confusing, partly because there were numerous certificates and several different bank accounts, as well as the inconsistencies in the testimony hereafter set out, it appears that the funds the court was particularly seeking information about were those derived from a certificate of deposit in the amount of $10,000.00, held to be the property of Mr. Rose, the $3,886.34 which had been deposited for the benefit of the son, and the sum of $5,711.30 which had been withdrawn and then deposited by Mrs. Rose in her own name in Leader Federal.

While these were the properties the court was principally interested in, the examination of Mrs. Rose covered all of the funds that appellant had taken possession of, the bulk ($35,400.00) of which had been awarded her as a gift from her husband at the time she was awarded a divorce from bed and board. Of course, all funds had been commingled and in ascertaining the disposition of funds not properly held by appellant, it was necessary to include interrogation about all. The evidence of how much money Mrs. Rose held in her own right was only, of course, pertinent to the question of a proper award of alimony, and the question of the payment of attorney's fees. The record reflects the difficulty encountered in seeking information from appellant.

Mrs. Katherine Ladd, who has served as the court reporter for the previous judge (Judge Ford Smith) was subpoenaed and testified from her notes at a hearing held on October 14, 1970 before Judge Smith. That portion of the record is as follows:

"Q. What about the interest on this $35,000?

A. I have spent it and paid bills and repaired the home.

Q. You are still drawing interest on it?

A. I don't have it anymore.

Judge Smith. They do pay you interest on it?

A. Yes

Judge Smith. But you have disposed of the $35,-000.00?

A. I have needed it this year.

Q. Do you not own the $35,000.00 anymore?

A. Yes, that is true.

Q. You are telling the Court that you have disposed of since last April of $35,000.00?

A. Yes, but a lot of that was past due debts.

Q. What did you owe?

A. Several debts.

Q. You can't tell me what you did with the $35,000.00?

A. No.

Q. You are still receiving the interest on $13,800.00 in Sammy's name?

A. No.

Q. Have you disposed of that?

A. Yes.

Q. Did you use it for Sammy's benefit?

A. Yes, anything we needed.

Q. In addition you spent $13,886.34 for Sammy's benefit?

A. For the home, for me and for Sammy.

Q. You have spent a total of $48,000.00?

A. I did not say I spent it. I do not have it anymore.

Q. Can you tell me what you did with any part of it?

A. No.

Q. Is it a fact that you won't tell me or you cannot tell me?

A. It is partly both.

Q. You are refusing to answer the question?

A. Yes, I cannot.

Mr. Ray. Tell the witness to answer the question please.

Judge Smith. She says she cannot tell you.

Q. Mrs. Rose, you are—do you realize that you are under oath?

A. Yes.

Q. And you are telling me now that you do not know what you did with Certificate of Deposit No. 196, in the amount of $10,000.00?

A. I can't even tell you if you are reading the right number.

Judge Smith. You cannot or you will not?

A. Both.

Judge Smith. If you can, you will answer the question; if you cannot, then you cannot.

A. I cannot.

Judge Smith. But you have disposed of it?

A. Yes.

Judge Smith. By gift or otherwise?

A. By debt and gift and entertainment for me and Sammy, that we have never had before. Sammy has never been left out of anything I have ever done.

Judge Smith. She says she spent it for entertainment on herself and for her son.

Q. I am looking at a Certificate of Deposit at Forrest City, made payable to you and Mr. Rose, in the amount of $10,000.00. What did you do with that?

A. The same thing I did with the last one.

Judge Smith. How did you spend the money that belonged to the boy? Did you endorse his name to it?

A. Yes, sir.

Q. I am looking at a Certificate of Deposit issued by the Bank of West Memphis, dated July 18, 1966, made payable to you in the amount of $10,000.00, what did you do with that?

A. The same thing.

Q. If I should read all of these certificate numbers, you would tell me the same thing on each one?

A. Yes, sir.

Judge Smith: How much does this total?

Mr. Ray. To her $35,000.00, and the son was $13,-886.34.

Judge Smith. Making a total of $48,886.00 ***

Q. I ask you, do you have any of this money in any account?

A. Not any of this money, I do not have.

Q. Do you have any money that he has paid you?

A. No, sir.

Q. You have in addition spent, a year from to date, and assuming that he has paid you every payment, you have spent $5,000.00 in addition to this money?

A. I can't say I have spent it; it has slipped through my hands."

At a hearing held on November 23, 1971, before the present chancellor, the transcript of the proceedings includes the following:

"BY THE WITNESS [Mrs. Rose]: Your Honor, there has been a lot of money, and this money has all—these certificates has all been cashed in the banks that they were in. They were everywhere, and they were— —And I have deposited every dime I could get my hands on in this one bank, and the way he is doing it, one at a time, if he would do it all at one time and ask me, I can explain every bit of it to you —and would be happy to do it.

Q. Mrs. Rose, let me ask you a question. Did you not between February 2, 1970, and June—July 15, 1970, deposit $37,527.31 in the National Bank of Commerce in Account 01-151-998-2?

A. Ah, do you mean deposit it in the bank?

Q. Yes ma'am.

A. I probably did, but it was left there no longer than I could write another check on it. *** I have deposited everything I had in the bank and turned around and bought stock with it in the National Bank of Commerce in this year you are talking about, and then it has all been take—every dime I had, all these you are talking about, Leader Federal and all these other banks, every dime I had from every source, my money, the money that the Court gave me before—every dime, was all put in this bank and that's all I had everywhere, except maybe two or three hundred dollars ($200 or $300) in the bank at Hughes. ***

Q. There are checks here that I would like to submit to you to help the showing that there have been deposits of $55,830.35 in that bank, and there is only withdrawals there of $43,000.00.

A. Well, if it hadn't been draw—withdrawed, it's still there and I don't know nothing about that either,—but it has been withdrawed and put in this and I bought stock with every dime I had. There is no money nowhere. I have $11.00 in the bank. Everything has been put right here, everything. *** I have said that my money has been withdrawed from all banks, all sources, everywhere—money I had in the deep freeze or safe at home, everywhere,—has been brought out and put in this one bank and I had two (2)—ah, ah, stocks or bond, I don't know what they call them, sir. I had them there, one of them was $28,000.00, and one—around $58,000.00, and it was all put there in the bank together, after I got it all together. He could drag up things like this for a week in the—in the last twenty years (20 yrs.) we've been married. ***

Q. Mrs. Rose, assuming for the purposes of the record, that the checks introduced here as being deposited in the National Bank of Commerce, totaled $55,838.35, and the deposits on the accounts which have been introduced in the same bank, only

shows a little more than $44,000.00, do you recall drawing $11,000.00 in cash at anytime in that—in the checks that you deposited in that bank?

A. It shows—what did I have in the bank at one time?

Q. It shows that you had checks going through that bank, to be apparently deposited, of $55,838.35. Your deposits show that I believe you deposited $44,165.00.

A. I don't recall without the balance could be interest that I just—

Q. Do you recall at anytime withdrawing cash of $11,000.00?

A. No sir, I don't. I just don't know."

Subsequently, Mrs. Rose stated she had withdrawn all of her deposits and she was then asked what she had done with the withdrawals:

"A. Well, it'll be hard to explain and you'll never believe it. I don't know why—how to explain it. All I can tell you is now I have $30,000.00 and I owe at least $15,000.00 of that.

Q. Mrs. Rose, your attorney can bring out what you owe, I'm interested in what you have.

A. I have $30,000.00, sir.

Q. Where do you have that?

A. I have it in cash, and it's buried.

Q. And it's buried.

A. And it's not in no bank.

Q. It's not in anybody's possession but your's?

A. But mine.

Q. Yes ma'am, you have now—you are telling this Court now that you have $30,000.00 buried?

A. In cash money.

Q. Are you -

A. Cold cash.

Q. Are you talking about buried in the ground?

A. Yes, sir.

Q. And when did you bury that?

A. I couldn't tell you the date when I buried it.

Q. Well, has it been recently?

A. Yes, sir.

Q. Within what period of time? Six months—three months?

A. The last year, anyway.

Q. Mrs. Rose has it been within the last three months?

A. I don't know.

Q. Ma'am?

A. I wouldn't recall."

Subsequently, she stated she had given the money to her father to keep for her.

All in all, four or five different versions were given.

At a hearing in early January, 1972, the court again emphasized that it was interested in what she did

with the approximately $20,000 that she had taken that was not awarded to her by the court and was commingled with her property. Another hearing was conducted in February, 1972, but like the others, it shed but little, if any, light on the subject. After repeated questioning relative to what had been done with the money, Mrs. Rose responded, "I spent all of our money, my money, everybody's money, but $26,000. I don't know how to put it to you any better."

Following this last hearing, the court entered its findings, pertinent portions reading as follows:

"Her testimony at this time was more evasive, contained more inconsistencies and was less credible than that at previous hearings. One who has on that and all other occasions observed her manner and demeanor and noted the inconsistencies between her direct and cross examination can attribute little or no credibility to her testimony. The Chancellor will not here attempt to point them out, but the record is replete with these variations.

"If the Court was to accept her testimony as to the accounting or if she had been able to fully document it, could anyone say that her stated reasons for her actions here improves her position? To the contrary, she would have slain herself with her own sword. She stated to the Court that she had come into this Court in the prior action asking its protection and relief, but not being satisfied with what she had received at the hands of the Court she did what she felt she wanted to do; took that which the Court gave her and whatever else she wanted, desired or could find.

"As she did not feel that the award of the Court was sufficient to maintain her in the standard to which she had become accustomed, she, while accepting all the benefits, felt relieved of the burdens of that award.

"In so far as her disposition of the money in issue is concerned, the Chancellor, quite frankly, does not

know what to believe. However, if she spent, as she now indicates (rather than in the manner which she has on two or three other occasions testified) would she be in any more tenable position that if she in fact, has these funds invested in treasury bills which defendant suspects and offered testimony to prove but which she says she lost at the races?

"The Court finds that the funds in issue in both Chancery cases were derived solely from the earnings of the husband. ****

"This conduct on her part in converting all three (3) sums to her own use, was wrongful and under the circumstances making it unconscionable. The Court finds from all the facts and circumstances here present, that she has not done equity while seeking it, and that her conduct disqualified her from receiving further consideration in this Court.

"The Court directs: All further relief prayed by the plaintiff herein denied."

The court kept in effect the order requiring Mr. Rose to pay medical expense and take care of the needs of his child.

One cannot read this record without feeling that Mrs. Rose deliberately set for herself a course of action so as to preclude the court from becoming informed as to what happened to the money at issue. Also, it seems clear that the chancellor gave her every opportunity to comply with his request and order. In fact, he exhibited a great deal of patience under most trying circumstances. There is no way, even though we were inclined to overlook Mrs. Rose's attitude in refusing to comply with the court's request, to determine what statutory allowances should amount to. It could even be that she has already received all that she would be entitled to under the law.[2] At any rate, if her statutory share is deficient, Mrs. Rose can only blame herself. The burden was on her to establish the amount to which she was entitled.

---

[2]Mr. Rose's financial statement reflected a net worth of $28,169.20.

An additional attorney's fee is sought by appellant, but under the state of the record, and it appearing that the additional hearings and voluminous testimony were largely the result of appellant's refusal to furnish the desired information, we feel constrained to deny the request.

In accordance with what has been said, we think the decree should be affirmed as herein modified, and the cause is remanded for the entry of a decree consistent with this opinion.

It is so ordered.

BYRD, J. dissents as to modification.